# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KIKO USA, Inc.,[1] | ) | Case No. 18-10069 (_____) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF FRANK FURLAN
## IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Frank Furlan, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of KIKO USA, Inc. ("KIKO" or the "Debtor"), a corporation organized under the laws of Delaware and the above-captioned debtor and debtor in possession.

2.      I have served in this role since June 2017.  Previously, from August 2016 through March 2017, I was employed as Chief Executive Officer of Perfumania, a fragrance/ancillary retailer with more than 300 locations within mainland U.S.A. and Puerto Rico.  Prior to that role, I held various positions with The Swatch Group from 2000 through 2016.  From January 2012 through June 2016, I served as President/CEO of The Swatch Group (U.S.) Inc., and spent from 1987 to 2000 in various middle and upper management roles (regionally in the U.S.A./Americas

---

[1]      The last four digits of the Debtor's federal tax identification number are 0805.  The principal place of business for the Debtor is 470 Park Avenue South, 15th Floor New York, NY, 10016.

and Europe for Revlon, Estee Lauder Companies, Bijan Fragrances and Seprocom - a consultancy).

3.        I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of this chapter 11 case and in support of the Debtor's chapter 11 petition and certain motions and applications filed today.

4.        Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtor's management team and advisors, my review of relevant documents and information concerning the Debtor's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

**Preliminary Statement**

5.        The Debtor is a retailer of cosmetics and a wholly-owned subsidiary of KIKO S.p.A., an Italian corporation.[2]  KIKO S.p.A. was founded in 1997 by Stefano Percassi, and it is controlled, through Odissea S.r.L., by Antonio Percassi, an Italian entrepreneur who has founded family-owned companies (collectively, the "Percassi Group") based in Bergamo, Italy.  KIKO

---

[2]        In approximately October 2014, KIKO S.r.L. restructured its corporate form in Italy to become KIKO S.pA.  All references to KIKO S.p.A. herein refer to the predecessor to the extent the actions were taken prior to such reorganization.

- 2 -

S.p.A. has grown in size, through itself and various subsidiaries, to over 1,000 KIKO-branded retail locations across Europe, the United States and various other global markets (including United Arabs Emirates, Turkey, India, Hong Kong, and Russia).

6.     The Debtor was incorporated as a Delaware corporation in March of 2013. Shortly thereafter, the Debtor began leasing retail stores in the United States, primarily in "Class A" malls (prime locations).   The Debtor currently operates 29 retail store locations – 28 in U.S.A.   mainland   and   1   location   in   San   Juan,   Puerto   Rico.     See http://www.kikocosmetics.com/en-us/utils/store-locator.html.

7.     Through the Debtor, KIKO-branded products are advertised, marketed, and sold in retail stores in the United States as affordable European-designed and produced products for every consumer, without a particular targeted consumer.  The Debtor's products are also available in the United States via online sales via the Debtor's website http://www.kikocosmetics.com/en-us and, more recently, on Amazon.com utilizing the Fulfillment by Amazon program (Amazon Prime).  The products are sourced and purchased by KIKO USA through KIKO S.p.A., and warehoused locally and supplied into the U.S.A. operations (Stores and Ecommerce) through a third party external logistics provider (Wit Logistics) based in Monroe Township, New Jersey.

8.     Unfortunately for the Debtor, its retail sales have not been sufficient to cover its costs, which consist primarily of rent and labor.

- 3 -

9.      The Debtor's sole shareholder, KIKO S.p.A, has provided equity advances to the Debtor, from time to time, allowing the Debtor to have sufficient liquidity to cover its prior operating losses.

10.     At end of July 2017, I was tasked with trying to negotiate lower rents and/or early termination payment from most of the Debtor's landlords.  While the Debtor approached most of its (San Juan Mall excluded) landlords, and offered buyout payments for early termination, it was only able to achieve one early termination agreement, for a location that closed December 31, 2017.  Additionally, the Debtor has exercised its contractual termination rights based on store sales at its Garden State Plaza, New Jersey location, with such termination to be effective in May, 2018.

11.     Both the KIKO.com and Amazon business units are progressing positively in terms of sales, reflecting a consolidated double digit increase in December 2017 vs. previous year.  The company activated Amazon Prime in August 2017.

12.     The Debtor is working closely with its advisors on closing underperforming stores and negotiating go-forward concessions with remaining landlords to ensure long-term viability. The Debtor has commenced store closings and plans to close 24 remaining underperforming stores.  The Debtor expects to complete these 24 store closings (and vacate such premises) by February 28, 2018 and reject the corresponding leases by no later than February 28, 2018.

- 4 -

13.    To familiarize the Court with the Debtor, its business, the circumstances leading to this chapter 11 case, and the relief the Debtor is seeking in those certain motions and applications filed contemporaneously herewith, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtor's corporate history and operations;

- **Part II** describes the circumstances leading to this chapter 11 case;

- **Part III** describes the Debtor's proposed chapter 11 plan; and

- **Part IV** sets forth the evidentiary basis for the relief requested in each of the first day pleadings.

## II.    The KIKO Brand.

14.    KIKO S.p.A. was founded by the Percassi Group in Bergamo, Italy in 1997.

15.    With a growing and loyal customer base, consisting primarily of women aged 18–55, KIKO focuses on four key elements—color, value, variety, and product innovation.  KIKO has a distinctive color-focused merchandising model in which key products are available in an extraordinarily wide array of colors and store merchandise is organized on a product/collection category basis, creating an aesthetically unique experience.  KIKO's products are competitively priced in the "sweet spot" between expensively priced luxury cosmetic brands and economically priced mass cosmetic brands.  Since its founding, KIKO has been on a purposeful mission to make trying and purchasing color cosmetics a fun experience – and bringing a higher degree of self-esteem to its customers.  KIKO offers unique products that are both in-style and affordable.

- 5 -

Store locations are stocked with an average of 1,500 differing products, across a range of colors to fit any occasion/preference and most skin types.  KIKO launches over 500 new products per year through full seasonal collections and "capsule" limited editions.

16.    While the goal of a fun and unique customer experience has always been foremost at KIKO, unpredictable industry-wide market challenges in brick and mortar retail locations (notably, declining traffic in traditional shopping malls and certain street locations and the inability/lack of willingness by landlords to adjust rents to these operating realities) have led to extremely high operating costs and continually depressed profits in recent years.  Importantly, however, a loyal customer following, an experienced management team, and the company's new strategic plan, should give KIKO's stakeholders confidence that the company has a clear path to return to strength and eventually achieve a prominent market positioning in the U.S.A.

A.    **The Debtor's Business Operations.**

1.    **KIKO's Geographical and Digital Presence.**

17.    ***Brick-and-Mortar Presence***. The 29 retail stores in the U.S.A., located in 26 shopping malls and 3 street locations as of the Petition Date, are:

- 2 in Connecticut: Danbury Mall, Trumbull Mall;

- 5 in New Jersey: Garden State Plaza Mall, Deptford Mall, Newport Jersey City Centre Mall, Woodbridge Center Mall, Rockaway Townsquare Mall;

- 6 in New York: Kings Plaza Mall, Times Square street location, World Trade Center Mall, Queens Center Mall, Staten Island Mall, Palisades Center Mall;

- 6 -

- 1 in Rhode Island: Providence Mall;

- 2 in Florida: Lincoln Road street location, Sawgrass Mills Outlet Center Mall;

- 1 in Maryland: Annapolis Mall;

- 1 in Puerto Rico: Mall of San Juan;

- 1 in Texas: McAllen La Plaza Mall;

- 2 in Virginia: The Fashion Centre at Pentagon Mall, Potomac Mills Outlet Mall;

- 7 in California: Los Cerritos Center Mall, Stonewood Mall, Hollywood and Highlands street location, Lakewood Centre Mall, Northridge Fashion Centre Mall, Del Amo Fashion Centre Mall, Thousand Oaks Mall; and

- 1 in Nevada: Fashion Show Mall.

18.     **The eCommerce Platform**. In addition to a diverse physical store footprint, the Debtor maintains an online presence.  Customers may purchase products via the Debtor's eCommerce platform.  A user-friendly and well-curated eCommerce online platform is crucial to ensuring a seamless customer shopping experience.  To that end, KIKO is investing significant time and resources to expand and improve its website to compete with richer experiences provided by certain of its competitors.  Additionally, to further expand its existing and new customer reach and acquisition, the Debtor activated its own micro-shopping site on Amazon Prime in August 2017.  Results have proven very positive and have created a new marketplace

- 7 -

for customers to seamlessly purchase products.  Product ranges are continually being expanded to bring a more robust offering to customers.

2.  **Overview of KIKO's Merchandise and Key Customer Base.**

19.  As discussed, KIKO offers specialty cosmetics and beauty products.

20.  Consumers continue to rely on KIKO for in-style and affordable products. KIKO's retail price points and demographics cover a wide range, reflective of the variety of products stocked in its stores and the tastes of its customers.  KIKO's selection remains its strongest product offering.  KIKO places an emphasis on primarily "face" cosmetic products and cutting-edge features to provide its customers with unique and iconic looks, both in traditional and dramatic ways.  This approach has required offering a wide assortment of products, and launching in-demand new products (at the rate of more than average 1 per day, over 500 annually), to satisfy and meet customer demands and requests.  Essential to the brand is the core positioning of a wide range of products that are unique, innovative, and reflect the latest trends. For example, regular launch items perfect for gifts and special occasions are widely available, holiday themed products, and a shopping environment that allows customers to "play with and try" products before purchasing.

21.  KIKO's loyal customer base shops regularly in its stores and is an advocate for the brand.  The customer base consists primarily of women of all ages and spending preferences, with women aged 18 to 55 composing KIKO's core customer base.  These core customers shop

- 8 -

at KIKO several times per year and represent a significant portion of its customer base. Conversion across KIKO's customers entering locations ranges from 25%–35% on average.

###   B.     Critical Components of the Debtor's Cost Structure.

###     3.     Supply Chain.

22.     The Debtor purchases its inventory through a Supply Agreement with KIKO S.p.A.  The Debtor has a contract with Wit Logistics for storage and transportation of inventory and fulfillment of ecommerce orders from the Debtor's website.

###     4.     Employee Compensation and Benefits.

23.     The Debtor employs 244 employees, including 95 full-time employees, 105 part-time employees, and 44 seasonal employees (collectively, the "Employees").  In light of the Debtor's planned store closings and related reductions in force, the Debtor anticipates that its monthly gross Employee Compensation, including wages, salaries, and related compensation, will range from $0.59 million to $0.33 million during the pendency of this chapter 11 case.  The Debtor offers its Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical and dental plans, life insurance, accidental death and dismemberment insurance, disability benefits, workers' compensation, retirement plans, non-insider incentive programs, paid time off, severance, director compensation, and other employee benefit plans.  The Debtor anticipates that its payment on account of these employee benefit plans will range from $0.03 million to $0.02 million during the pendency of this chapter 11 case.  As the Debtor implements right-sizing measures, including a reduced physical store

- 9 -

footprint, the Debtor believes a more efficient allocation of employees will present a significant opportunity for savings.

5.    **Real Estate Obligations.**

24.    The Debtor leases all of its store locations. The Debtor estimates that the aggregate occupancy costs for the Debtor's go-forward freestanding stores will be $3.9 million in fiscal year 2018, excluding tenant amortization. The Debtor leases 9,946 total square feet of office space in Manhattan, New York, consisting of its corporate headquarters. Of this amount 4,436 square feet have been subleased to KSH CAPITAL LP. This sublease is due to expire on February 28, 2018, and the Debtor anticipates rejecting its office lease as of February 28, 2018. The Debtor will relocate its remaining office employees - currently 17 - to a temporary location until it can secure a suitable smaller office footprint going forward. The Debtor anticipates 5 go-forward locations, under acceptable terms, in the United States following its store closures (described in greater detail below). The remaining store presence is anticipated to be comprised of: (1) Times Square, New York, (2) Lincoln Road, Miami, (3) Las Vegas Fashion Show Mall, (4) Sawgrass Mills, Sunrise, Florida and (5) Hollywood & Highland in Los Angeles.

III.    **Events Leading to this chapter 11 case.**

25.    A confluence of factors contributed to the Debtor's need to commence this chapter 11 case. These include macroeconomic factors—including most significantly, the general downturn in the retail industry, notably in shopping malls, which has led to a decrease in sales and the marked shift away from brick-and-mortar retail to online channels. Over time, these

- 10 -

factors have tightened the Debtor's liquidity. As described above and in further detail below, these factors culminated in a liquidity crisis by the fall of 2016, when KIKO faced dwindling cash flows and sales projections well under historical numbers.

C.      Challenging Operating Environment and Operational Right-Sizing.

26.     The Debtor, along with many other consumer products goods and retail companies, has faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores, especially in shopping malls. Given the Debtor's substantial brick-and-mortar presence (29 locations, of which 26 are within shopping malls), and the expenses associated therewith, the Debtor's business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets. The combination of the above factors, and others plaguing the consumer products goods/retail industry as a whole, contributed to the Debtor falling short of its sale targets and severely depressed profitability performance.

D.      **Operational Right-Sizing Initiatives.**

6.      **Real Estate Optimization.**

27.     Starting August 2017, the Debtor commenced the process of negotiating with landlords directly (attributed to the ongoing operating income losses) initially by trying to exit 15-18 store locations across the United States. These first 3 month efforts culminated in only 1 successful closure. All other landlords declined to negotiate or consider alternatives. This inaction further exacerbated the ongoing operating income losses. The closure of 25 total

- 11 -

locations is expected to generate a reduction in operating losses of $7.1 million on a yearly basis. In anticipation of these closings, the Debtor recently engaged Perkins Coie and Getzler Henrich to advise KIKO on the filing and restructuring process, with a mandate to begin proceedings to close and exit 24 of the 29 current retail locations as expediently as possible.  Following the store closings, the Debtor anticipate 5 go-forward locations, and continuation of its KIKO.com and Amazon Prime business units in the short term.

### 7.    **Launch of the New Strategic Plan**

28.    The Debtor, recognizing the need to critically reevaluate its business, has developed a comprehensive operational restructuring to simplify its business and build on the core strengths of KIKO.  This "New Strategic Plan" consists of six fundamental components: (a) refocusing on product assortment and targeted in-demand products; (b) realigning the distribution, focusing on its 5 prime remaining retail locations while actively pursuing opportunities with a third party retailer that can present the KIKO brand in the right way to the customer and provide a more comprehensive distribution network and reach; (c) enhancing the customer experience (quality/level of staff and training); (d) optimizing targeted marketing to deliver ROI (return on investment); (e) implementing significant organizational changes; and (f) growing the company's eCommerce and Amazon Prime offering.  Fundamental to this New Strategic Plan is a realigned financially optimized structure that can platform KIKO for re-establishment and strength in this market.

- 12 -

## (a)  Refocusing on Product Assortment

29.    The *first* component of the New Strategic Plan aims at shifting the company's focus and efforts to maximizing the potential of its products in its 5 remaining retail locations and its Ecommerce and Amazon Prime business units.  This component of the New Strategic Plan involves, among other things, a focus on a reinforcement of trend-right/in-demand products and value, bringing the highest quality and innovation in the Debtor's products, and a renewed focus on customer demand and analytics to assure proper stock assortments, stock levels and real-time responses through proper supply chain processes.

## (b)  Realigning the Distribution.

30.    The **second** component of the New Strategic Plan foresees the closure of the majority shopping mall locations (25 of 27) that continue to incur traffic declines and continuing adverse financial impacts to KIKO, as mentioned previously. KIKO will refocus its resources/investments on the 5 highest potential traffic and strategically important retail locations in its portfolio, under acceptable terms.  These 5 stores, located in densely populated and touristic areas, provide the highest degree of brand exposure both to local and international traffic (where many customers know KIKO already) and establish conversion potential both to KIKO's existing and new consumer base.   KIKO will also pursue strategically viable opportunities, initially with a third party brick and mortar retailer that can complement the brand positioning of its own KIKO retail stores, while providing the necessary broader demographic and geographic reach across the U.S.A.

- 13 -

### (c)      Enhancing the Customer Experience.

31.      The *third* component of the New Strategic Plan seeks to improve the customer experience to drive customer conversion.   The Debtor expects to achieve that goal by (a) implementing impactful in-store marketing and event initiatives to maximize product relevance, (b) increase in-store training programs and initiatives, both from a product and selling skills perspective, which is key to achieving incremental customer conversion, (c) lessening administrative burdens, so the staff can focus on selling and the customer, and (d) ensuring that the customer's experience is optimal at every "touch point".

### (d)      Optimizing Targeted Marketing.

32.      The *fourth* component of the New Strategic Plan aims to refocus the Debtor's marketing efforts on the "targeted" customer to build brand awareness and generate traffic both in its remaining 5 locations, its eCommerce businesses, and eventually its third party retailer operations.   This strategy involves (a) improving coordination between marketing and merchandising focuses, (b) improving the effectiveness of existing marketing channels to deliver tangible return on investments (ROI) against spending, (c) selectively increasing new customer acquisition efforts by, among other things, boosting messaging to lapsed customers, while working more aggressively in expanding social media "influencer" channels especially on main audience sites such as Instagram, and (d) a redesign of KIKO's customer loyalty (CRM) program.

24249537.1 01/11/2018

**(e)      Implementing significant organizational changes.**

33.      The *fifth* component of the New Strategic Plan seeks to produce a simplified and more efficient "horizontal" structure that will work harmoniously across its retail store, eCommerce and, eventually, third party sales channels.

**(f)      Growing the Company's eCommerce Offering.**

34.      The *final* component of the New Strategic Plan seeks to bolster the Debtor's preexisting eCommerce platform.  The Debtor believes that eCommerce augments the brick-and-mortar model, and solidifies the seamless customer shopping experience.  In support of this component with KIKO.com, the Debtor will be reinforcing these efforts, seeking in the mid-long term to establish an omni-channel strategy.  At the same time, the Debtor will continue to bolster its presence and product offering on Amazon Prime, and eventually seek to launch eCommerce on a third platform with a selected third party retailer.  These synchronized and harmonious online strategies will deliver needed additional brand exposure, presence, and revenues for KIKO across the U.S.A., and bring its products closer to a new and substantially larger audience.

**IV.    The Proposed Shareholder DIP Loan and Chapter 11 Plan.**

35.      KIKO S.p.A., as the Debtor's sole shareholder, has agreed to provide the operating capital necessary to operate in Chapter 11 via a debtor in possession loan pursuant to 11 U.S.C. § 364.

36.      The Debtor's plan of reorganization (the "Plan"), will provide operationally for the reorganized Debtor to emerge from chapter 11 with 5 core retail locations as well as its

- 15 -

ecommerce business through its own web site and Amazon.com.  Allowed claims of unsecured creditors will be paid in full under the plan upon its effective date.

**V.      Evidentiary Support for First Day Motions.**

37.      Contemporaneously, the Debtor has filed a number of first day pleadings seeking relief that the Debtor believes is necessary to enable them to efficiently administer its estate with minimal disruption and loss of value during this chapter 11 case.  The Debtor requests that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtor's estate.  I believe that the relief requested in the first day motions is necessary to allow the Debtor to operate with minimal disruption during the pendency of this chapter 11 case.  I have reviewed each of the first day motions discussed below and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  A description of the relief requested in and the facts supporting each of the first day motions is set forth in **Exhibit A** attached hereto and incorporated herein by reference.

[*Remainder of page intentionally left blank*]

- 16 -

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: January 11, 2018                    /s/ Frank Furlan
New York, New York                         Name:  Frank Furlan
                                           Title:   Chief Executive Officer

- 17 -

## EXHIBIT A

### Evidentiary Support for First Day Motions[1]

**I.**     **Debtor's Motion For Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtor To: (A) Continue Using Its Cash Management System; (B) Maintain Existing Bank Accounts And Business Forms; And (C) Continue Conducting Intercompany Transactions In The Ordinary Course; (II) Granting Administrative Priority Status to Intercompany Claims; And (III) Granting Related Relief (the "Cash Management Motion").**

1.     Pursuant to the Cash Management Motion, the Debtor seeks entry of interim and final orders: (a) authorizing, but not directing, the Debtor to (i) continue to utilize its prepetition Cash Management System; (ii) maintain its existing Bank Accounts and utilize its existing Business Forms in the ordinary course of business; and (iii) continue to perform Intercompany Transactions consistent with historical practice and granting administrative priority status to such Intercompany Transactions.

2.     The Debtor utilizes the well-established and efficient mechanisms of the Cash Management System for collection, concentration, management, and disbursement of funds used in its business activities.

3.     The Cash Management System is comparable to centralized cash management systems used by similarly situated companies to manage the cash of numerous operating units in a cost-effective, efficient manner.  The Debtor designed the Cash Management System to meet

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.  To the extent of any conflict between this summary and the applicable First Day Motion, the applicable First Day Motion shall govern.

its specific operating needs and uses the Cash Management System in the ordinary course of its businesses to collect, transfer, and disburse funds generated from its business activities and to facilitate cash monitoring, forecasting, and reporting.

4.      The Debtor's finance team manages the Cash Management System from New York, New York.  Among other things, the Cash Management System enables the Debtor to conduct efficient electronic transfers of funds, thereby reducing the administrative burden of manual transfers and the costs associated therewith.  The Debtor's finance personnel maintain oversight over the Cash Management System and implement cash management controls for processing and releasing funds.  Additionally, the Debtor's finance personnel regularly reconciles the Books and Records to ensure that all transfers have appropriate authorizations and are accounted for properly.

5.      The Debtor has implemented internal procedures to control or prohibit payments on account of prepetition debts without the prior approval of the Debtor's management and this Court.

6.      Because of the disruption that would result if the Debtor was forced to close its existing Bank Accounts, I believe that it is critical that the existing Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11.  Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

- 2 -

II.     **Debtor's Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtor to Pay and Honor Prepetition Employee Obligations; (II) Maintain and Continue Certain Compensation and Benefits Programs Postpetition, and (III) Granting Related Relief (the "Wages Motion").**

7.      Pursuant to the Wages Motion, the Debtor seeks entry of interim and final orders (a) authorizing, but not directing, the Debtor to (i) pay prepetition wages, salaries, other compensation, withholding obligations, payroll processing fees, reimbursable employee expenses, non-insider employee incentive programs and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, in an aggregate amount not to exceed $275,000 and (b) granting related relief.

8.      The Debtor employs approximately 244 Employees, including approximately 95 full-time Employees, 105 part-time Employees, and 44 seasonal Employees.  The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtor's estate.  In certain instances, the Employees include personnel who are intimately familiar with the Debtor's business, processes, and systems, and who cannot be easily replaced.

9.      I believe that preserving and maximizing the value of the Debtor's estate depends on a stable workforce and that any delay in paying the Prepetition Employee Obligations will adversely impact the Debtor's relationships with its workforce and could irreparably harm morale, dedication, confidence, and cooperation.  Furthermore, I believe that employee departures could jeopardize the stability of the Debtor's workforce, posing substantial risk to the Debtor's continued operations.

- 3 -

10.     The majority of Employees rely on the Employee Compensation to pay their daily living expenses.  Additionally, certain of the Employees take advantage of the benefit programs offered by the Debtor, including the Health Plans, and if the Debtor is not authorized to pay the Prepetition Employee Obligations and continue the benefit plans in the ordinary course on a postpetition basis would be forced to either forego coverage entirely or obtain potentially expensive coverage to maintain those benefits.

11.     The Debtor seeks to minimize the personal hardship the Employees would suffer if the Prepetition Employee Obligations are not paid when due or as expected.

12.     I believe that payment of the Prepetition Employee Obligations is a necessary and critical element of the Debtor's efforts to preserve value and will give the Debtor the greatest likelihood of retention of its Employees as the Debtor seeks to operate its business in this Chapter 11 Case.

13.     Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the Wages Motion.

**III.     Debtor's Motion For Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Assessments and (II) Directing Financial Institutions to Honor and Process Related Checks and Transfers (the "<u>Tax Motion</u>").**

14.     The Debtor requests authority to: (a) pay various Taxing Authorities all Taxes that arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods before the Petition Date, in an aggregate amount not to exceed

- 4 -

$140,000 on an interim basis and $160,000 on a final basis, absent further order of the Court; and (b) direct the Banks to receive, honor, process, and payments relating to the Taxes. Only current Taxes for which the last day to pay without incurring a penalty has not expired will be paid, unless otherwise authorized and ordered by the Court.

15.     In connection with the normal operation of its business, the Debtor collects, withholds and/or incurs an assortment of Taxes that it remits periodically to various Taxing Authorities. The Debtor must continue to pay the Taxes to avoid potential costly distractions during this Chapter 11 Case. Specifically, the Debtor's failure to pay the Taxes could adversely affect the Debtor's estate because the governmental authorities could file liens or seek to lift the automatic stay. Additionally, failure to satisfy the Taxes may jeopardize the Debtor's maintenance of good standing to operate in the jurisdictions in which it does business.

16.     I believe that the relief requested in the Tax Motion is in the best interests of the Debtor's estates, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its businesses in this Chapter 11 Case without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Tax Motion should be approved.

**IV.     Debtor's Motion For Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, Including Broker Fees and (B) Renew, Supplement, or Purchase Insurance Policies; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief (the "<u>Insurance Motion</u>").**

17.     The Debtor requests authority to: (i) continue honoring its obligations under the Insurance Policies and satisfy payment of prepetition obligations related thereto, including the

- 5 -

payment of related broker fees, in an amount not to exceed $82,000, absent further order of Court; (ii) renew, supplement, modify, extend or purchase insurance coverage in the ordinary course of its business on a postpetition basis; and \(iii) direct the Banks to honor and process payment requests related to the foregoing.

18.     The Debtor's Insurance Policies are essential to the preservation of the value of the Debtor's business, property, and assets.  I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.  Failure to make the payments required by the Debtor's Insurance Policies could have a significant negative impact on the Debtor's operations.

19.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtor's estates, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business during this Chapter 11 Case without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

**V.     Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to (i) Honor Gift Cards and (ii) Administer Existing Customer Programs in the Ordinary Course Of Business (the "<u>Gift Card and Customer Programs Motion</u>")**

20.     Pursuant to the Gift Card and Customer Programs Motion, the Debtor seeks interim and final orders: (a) authorizing the Debtor to honor Gift Cards and (b) authorizing the Debtor to administer Customer Programs.

21.     The Debtor will honor all Gift Cards.  Gift Cards may be used at any store until store closing and at all stores that remain open indefinitely.  To the extent a customer does not

use his or her Gift Card, KIKO will provide a full refund.  The procedures for obtaining a refund are outlined in the Motion.  KIKO will stop selling Gift Cards at stores that are slated for closure upon the bankruptcy filing.

22.    The Debtor uses a variety of Customer Programs to create quality experiences for its customers.  For example, Sales Promotions consist of free shipping, online promotions and various markdowns.  While various Sales Promotions will be adjusted during the Chapter 11 case, any commitment made to a customer prior to the Petition Date will be honored.

23.    The Debtor also uses Refund and Exchange Policies to enhance the customer experience.  The Debtor will honor all Refund and Return Policies entered into prior to the Petition Date.

24.    In order to have a successful Chapter 11 case, I believe it is essential for the Court to approve the Gift Card and Customer Program Motion and respectfully request the Interim Order be entered.

## VI.    Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to Continue American Express Business Accounts (the "American Express Motion")

25.    Pursuant to the American Express Motion, the Debtor seeks interim and final orders (a) authorizing the Debtor to continue its American Express Program and  (b) authorizing the Debtor to pledge the American Express Program Collateral.

26.    In the ordinary course of business, the Debtor maintains a corporate credit card program with American Express through which the Debtor issues credit cards to certain personnel who use the cards for approved business purposes.

- 7 -

27.     Pursuant to the Credit Card Agreement, the Debtor is authorized to issue the American Express Accounts to its personnel for routine business purposes, including (a) travel airfare, (b) hotels and accommodations, (c) working meals and (d) certain on-line marketing and advertising.

28.     Seventeen (17) employees have American Express Accounts, with varying credit lines totaling approximately $150,000.

29.     The credit cards allow these employees, who are located throughout the United States and the World, to easily and efficiently make ordinary course purchases that are necessary to the continued operation of the Debtor's business.  The American Express Accounts are not easily replaceable on a timely basis.

30.     In addition, the Debtor requests authority to deposit the American Express Program Collateral in a new bank account which the Debtor will open at a bank that is a party to the Uniform Depository Agreement with the Office of the United States Trustee to secure the Debtor's obligations under the American Express Program.

31.     I believe it is essential for a successful Chapter 11 case for the Court to approve the American Express Program and respectfully requested the Interim Order be entered.

**VII.    Debtor's Motion for Entry of Interim And Final Orders Authorizing The Debtor To Retain Tiger Capital Group, LLC and Asset Recovery Advisors, LLC (the "<u>Tiger Motion</u>")**

32.     Through the Tiger Motion, the Debtor requests authority to retain a joint venture of Tiger and ARA pursuant to the Agreement attached to the Tiger Motion.

- 8 -

33.    The Debtor's leased locations have unique fixtures designed exclusively for the KIKO brand.  The Debtor does not want to simply abandon its fixtures because it cannot risk tarnishing the KIKO brand through re-use of such fixtures.  Therefore, at locations where the Debtor intends to reject leases, the Debtor desires to remove the fixtures and return the premises to the landlords in "broom clean" condition by no later than February 28, 2018 to minimize any further administrative rent payments.  In order to do so, it is necessary to retain one or more third-party construction vendors.

34.    The Debtor further requests that, in connection with approving Tiger's application, the Court grant Tiger authority to enter the stores slated for closure and permit access by parties to any security agreement such as copiers, postage meters and vending machines, to remove such property where appropriate at the direction of the Debtor and/or Tiger, subject to the Court lifting the automatic stay and/or directing abandonment as the case may be.

35.    Furthermore, the Debtor requests that, upon approval of the Tiger Motion, the Court authorize Tiger's compensation and reimbursement of costs without further order of the Court and without the need to file any further applications for same.

36.    As more fully detailed in the Agreement, the Debtor seeks relief to employ Tiger to perform the following services: (i) remove all the fixtures, furniture, audio and equipment on an orderly basis, (ii) leave each Location, as defined in the Agreement, in broom clean condition; and (ii) upon agreement assist with the packing of any merchandise not sold at any Location.

24249537.1 01/11/2018

37.     As more fully set forth in the Agreement, the Debtor seeks to compensate Tiger $595,000 for its services, inclusive of all expenses for 24 locations or $24,791.66 per location. The debtor can unilaterally withdraw locations from the list in the event that a local vendor is preferable for various reasons.

38.     In order for Tiger to complete the fixture disposition across the diverse geographic platform by February 28, 2018, it is necessary that they get started as soon as possible.  Therefore, the Debtor requests that the relief sought in the Tiger Motion be granted on a first-day basis.

39.     The Debtor engaged in discussions with at least one other liquidator with the capability of providing similar services of the scope needed in the Debtor's bankruptcy case. After consideration of the proposals and negotiation with Tiger, the Debtor has determined that Tiger's proposal, as set forth in the Agreement, provides the most prudent method of moving forward.  Additionally, the Debtor two months ago completed the same exercise with another contractor for approximately $30,000 for one location.   Therefore, I believe the arrangement requested in the Tiger Motion is in the best interests of the Debtor and its estate, I request that the Court approve it.

24249537.1 01/11/2018